[Civ. No. 23095.   Second Dist., Div. Two.   Aug. 25, 1958.]

LAURA LENNIX WILLIAMS, Appellant, v. LEWIS
ISAAC WILLIAMS et al., Respondents.

Jacque Boyle and Sidney Gordon for Appellant.

Ruth A. Harris, in pro. per., Wilson, Carter & Flournoy and James L. Flournoy for Respondents.

FOX, P. J.—This is a suit for recission of a deed to real property. Plaintiff has appealed from a judgment in favor of defendants.

Laura Williams was the original plaintiff in this case; upon her death Marcilette Ingram, her administratrix, was substituted in her place. Marcilette is one of Laura's children. Laura's other children, Ruth Harris and Lewis Williams, are the defendants in this suit along with Lewis' wife, Virginia.

Early in 1956 Laura, who was then 61 years of age, became seriously ill and was forced to spend several weeks in a hospital. Laura became concerned over the mounting hospital and doctor bills and had many discussions with each of her children regarding this problem. While Lewis was of the opinion that Laura's home (the property which is the subject of this suit) should be rented to provide an income, both his sisters wanted the property sold. In fact, the sisters made

many efforts to persuade Laura to let them sell the furniture. Lewis opposed this action. Finally Laura decided that the house should be sold. It was determined that Laura should either execute a power of attorney or deed the property so that her children could handle the sale for her. Lewis was told by a real estate agent that Laura's transferring the legal title would be more desirable. Lewis suggested to Laura that all three children should be named in the deed. Laura stated that she did not wish Marcilette to be one of the grantees and even suggested that Lewis should be the sole grantee. However, when Lewis had the deed prepared by his attorney, he directed that Ruth and himself be named as grantees. Thereafter he took the deed to Laura and read her the contents. She approved and executed the deed on March 15, 1956. Although she was in the hospital at the time, she was fully coherent and had command of her faculties. She saw each of her children practically every day.

Lewis contacted several real estate agents in an effort to effect a sale of the property. Laura left the hospital on April 29, 1956, and went to live with Lewis and his family. Laura's doctor had informed the children that she would need constant care and should not be allowed to live alone. Late in May Laura was still worried about her medical bills and the house had not yet been sold. At this time Lewis and his mother entered into an agreement. Lewis was to receive the entire legal title to Laura's home. In return Lewis agreed to borrow $6,000 with which he would pay all Laura's medical bills, pay off the small mortgage on her house and defray certain expenses necessary in moving his family from his home into hers and in preparing his home for rental purposes. Lewis, his family and Laura were to live together in her home and Lewis was to provide food, clothing and care for Laura for the remainder of her life. There was a balance of $2,000 from the original loan which Lewis left in the bank; he told Laura that it was her money and that she could have it whenever she wanted it. The purpose of borrowing this extra $2,000, even though it was not then needed, was to provide a fund for any future operations or hospitalization without having to resort to another loan.

On May 21, 1956, Lewis and Ruth executed a deed conveying the property to Lewis and his wife. Laura approved this transfer. Lewis and his family and Laura moved into the subject property. Lewis effected the loan and paid the various bills. The dressing on Laura's foot required constant

changing and she was on a special diet. Lewis and his wife faithfully fulfilled Laura's needs in these respects.

After a short time Laura became dissatisfied with the arrangement and began to complain. Finally she gave Lewis formal notice of rescission of her transfer of the property in question. Lewis stated in writing that he would be willing to rescind on condition that he received compensation for the various expenses he had incurred and for the services he had rendered Laura. But Laura immediately filed this suit "for rescission, to cancel an instrument, for an accounting, and to quiet title." Laura continued to live in the house with Lewis and his family until the time of her death. Laura died in February, 1957, and the case proceeded to trial with Marcilette substituted as plaintiff. The trial court ruled that neither Laura nor her estate had any right, title or interest in the subject real property and rendered judgment for defendants. The court also denied any accounting.

Appellant's first contention is that the evidence is insufficient to sustain the finding that Laura's conveyance was free of undue influence. The rules governing this situation are clear:

"When a finding is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact. [Citations.]

"When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Primm* v. *Primm*, 46 Cal.2d 690, 693-694 [299 P.2d 231].)

Appellant argues that Lewis was in a confidential relationship with Laura, that Lewis exercised activity in procuring the deed, and that the consideration for the property was disproportionate to its value. From this she concludes that a presumption of undue influence arose, thereby shifting the burden of proof to Lewis. (*Kloehn* v. *Prendiville,* 154 Cal. App.2d 156, 161 [316 P.2d 17].) However, even if we assume that undue influence by Lewis could be presumed, the evidence is still sufficient to support the trial court's finding that the transaction was free of undue influence.

"Undue influence has been defined to be that kind of influence or supremacy of one mind over another by which

that other is prevented from acting according. to his own wish or judgment, and whereby the will of the person is overborne and he is induced to do or forbear to do an act which he would not do, or would do, if left to act freely. [Citations.]'' (*Webb* v. *Saunders,* 79 Cal.App.2d 863, 871 [181 P.2d 43].) ■ ''What constitutes undue influence and what constitutes sufficient proof thereof depend upon the facts and circumstances of each particular case.'' (*Sparks* v. *Sparks,* 101 Cal. App.2d 129, 135 [225 P.2d 238].) ■ In the instant case the evidence establishes that Laura transferred her title to the property because she wanted it sold; it was her own decision and Lewis, in fact, was opposed to such sale. Although Laura was in the hospital at the time she executed the deed, the evidence showed that she had full possession of her mental faculties, was at all times coherent, and that she knew what she was doing. She saw all her children regularly and constantly asked whether or not the house had been sold. When the property remained unsold after two months, Laura sought another means of solving her financial problem. She was living in Lewis's home and was being cared for properly. It appeared that neither of her other children could take care of her as well as Lewis and his wife. The agreement into which she and Lewis entered bestowed a great benefit on her; it completely solved the problems which had been distressing her for several months. Not only would she no longer have to worry about paying her medical bills, but she would also be assured that someone would take care of her for the rest of her life. Under such circumstances the trial court could properly deduce that Lewis did not gain any unfair advantage by the agreement. There was no evidence that Lewis coerced Laura into making this agreement. Her two daughters saw her practically every day during this period, and their constant presence tends to negate any inference that Lewis exerted undue influence upon her. Lewis's testimony clearly indicates that Laura made a free choice and exercised her own will in making the agreement.[1] It was, of course, within

[1]Relative to the discussion which Lewis and Laura had concerning his taking title to her home to the exclusion of the other two children, Lewis stated in part that ''she [Laura] said that it was hers to give; that they [the other children] were married, and had less responsibility, and that she was going to live with me, and in the period that she had been at our house, it had been to her liking, and that she wanted to give me the house for me to borrow only enough money to take care of the actual hospital bills, and moving expenses, and in that way I would have less money to pay per month, and I told her that I appreciated it, but that there was the possibility of the operation, and we had to take that into

the trial court's discretion to believe this testimony. The record as a whole provides ample support for the trial court's conclusion that the transaction was free of undue influence. The court therefore did not err in denying rescission or other relief with respect to the property in question.

Appellant's next contention is that the evidence is insufficient to sustain the findings that on March 15, 1956, Laura intended to convey all her right, title and interest in the property in consideration of the agreement with Lewis. The findings in this regard are quoted below.[2] In effect the court finds that Laura made the March 15 conveyance in consideration of Lewis's agreement to borrow money and pay her medical bills, care for her, and so forth. This is slightly inaccurate in that the evidence establishes that Laura conveyed the property on March 15 for the purpose of facilitating its sale for her by Lewis. However, she did intend to convey her legal title to the property at that time. Whatever equitable rights she might have had in the property were extinguished by the agreement which she thereafter entered into with Lewis, and under which he was to receive outright title to the property. Pursuant to that agreement she approved the transfer of title from Lewis and Ruth to Lewis and his wife.

---

consideration; that instead of getting one loan after another, it would be better to get one loan that would take care of it, up to $6,000; that I would give her $2,000 to be held for an operation or future hospitalization, or as she saw fit to use it.''

[2]With respect to the March 15 conveyance the court found:

"II

''That said conveyance was made voluntarily and without fraud or deceit or undue influence; that at the time said conveyance was made, the said Laura Lennix Williams was in possession of her faculties and mentally capable of executing the conveyance, and had knowledge that she had executed said deed, and intended to convey all of her right, title and interest in and to said real property.

"III

''That said conveyance was made in consideration that the said defendant Lewis Isaac Williams would borrow the sum of $6,000.00 with the said real property as security for said loan; that said defendant would provide support, shelter, food, medical care, and all the necessities of life for said Laura Lennix Williams for her lifetime; that said defendant and his family would remove from defendant's home to the subject real property; that the proceeds of the loan would be used in defraying a mortgage indebtedness against the subject real property in the approximate amount of $600.00; to pay the hospital and other medical expense of said Laura Lennix Williams; to pay all other indebtednesses of said Laura Lennix Williams; and to provide for future medical needs of said Laura Lennix Williams; that further sums were to be expended in repairing the home of defendants Lewis and Virginia Williams, and to provide for certain expenses incident to defendant's moving from his home to the subject real property.

And Lewis performed the acts required of him by the agreement; he paid her medical bills, paid off her mortgage, moved his family into her house, and provided her with the proper food and care. Laura was thereafter estopped to assert any right to the property. It is thus clear that the error in the findings is inconsequential and harmless.

Appellant's final contention is that "the judgment is against the law in that it upholds the conveyance involved but denies plaintiff the consideration for said conveyance." In this connection appellant argues that Laura's estate should recover from Lewis the $2,000 which Lewis was holding for Laura and the money to pay a $660 hospital bill which accrued during her last illness. It does appear from Lewis's testimony that part of his agreement was to hold the extra $2,000 for Laura's benefit.[3] Under such circumstances it appears that the trial court should have ordered that he account to her estate for such amount. However, he should not be required to pay the $660 medical bill in addition. One of the purposes of having the $2,000 set aside was to defray any future medical expenses which Laura might incur. Thus, this last bill should be paid out of the $2,000 which Lewis holds for the benefit of Laura's estate. The findings, conclusions and judgment should therefore be revised to provide for Lewis's payment of $2,000 to appellant as administratrix of Laura's estate.

The judgment is reversed with directions to enter new findings of fact, conclusions of law and judgment not inconsistent with the views expressed herein. Each side shall bear its own costs on appeal.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied September 22, 1958, and appellant's petition for a hearing by the Supreme Court was denied October 22, 1958.

---

[3]On this point Lewis testified as follows:

"Q. Did you tell her in substance, 'I have this other $2,000 for you, and any time you want it, you can have it'? A. That was the original deal.

"Q. That is what you told her? A. Yes.

"Did you consider that $2,000 her money? A. I considered it her money."